# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs June 23, 2015 at Knoxville

## STATE OF TENNESSEE v. DARREL DEAN HOCHHALTER

**Appeal from the Criminal Court for Davidson County**
**No. 2012-B-1816     Steve R. Dozier, Judge**

---

**No. M2014-01106-CCA-R3-CD – Filed July 29, 2015**

---

The defendant, Darrel Dean Hochhalter, was convicted by a Davidson County Criminal Court jury of six counts of sexual battery by an authority figure and one count of rape. He was sentenced to five years for each count of sexual battery by an authority figure and twelve years for the rape conviction. The court ordered that two of the sentences for sexual battery by an authority figure and the sentence for rape be served consecutively, for an effective term of twenty-two years. On appeal, he argues that: (1) the evidence is insufficient to sustain his convictions; (2) the trial court erred in admitting the forensic interview of the victim at trial; and (3) the trial court abused its discretion in sentencing him to twenty-two years in confinement. After review, we affirm the judgments of the trial court. However, we remand for entry of a corrected judgment in Count 7 to reflect the rape conviction as a Class B felony.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded for Entry of Corrected Judgment**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

David M. Hopkins, Murfreesboro, Tennessee (on appeal); Brent Horst and Harvey Slovis, New York, New York (at trial), for the Appellant, Darrel Dean Hochhalter.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Sharon Reddick and Rachel M. Sobrero, Assistant District Attorneys General, for the Appellee, State of Tennessee.

# OPINION

## FACTS

This case arises out of the defendant's numerous and various sexual encounters with his daughter, the victim, which occurred between April 22, 2008 and April 16, 2010. As a result, he was indicted for seven counts of sexual battery by an authority figure, one of which was dismissed before trial, as well as one count of rape. The defendant's wife was charged with one count of facilitation of sexual battery by an authority figure, but her case was severed from the defendant's.

At trial, the victim, who was nineteen years old at the time of trial, testified that the defendant was her father, and she had a sister who was four years younger than she. During the time period in question, her mother left for work around 8:30 a.m. and returned home around 5:00 or 6:00 p.m. The defendant worked nights, leaving the home around 2:00 a.m. and returning around 9:00 a.m. Her grandmother also lived in the home, but she primarily stayed in her room downstairs or in the living room and kitchen on the main level. She rarely went to the upstairs level, where the bedrooms were located.

The victim said that she was homeschooled in the sixth grade by the defendant, but she returned to school for seventh and most of eighth grade. In April or May 2008, during her eighth grade year when she was thirteen years old, the defendant withdrew the victim from school because the victim began cutting herself. The defendant believed the victim's friends were a bad influence on her.

The victim said that she and the defendant had "a great relationship" when she was little, but they grew apart as she became a teenager and wanted to be with her friends. During the time the defendant homeschooled her after withdrawing her from the eighth grade, the victim's and defendant's relationship "was strained but [they] were really close." She elaborated that the defendant "was just trying to relearn [her]."

The victim recalled that, following her removal from school, the defendant would wait in the bathroom while she showered, so he could check her legs afterwards to make sure she had not cut herself. The victim denied that the defendant ever got in the shower with her or touched her in the shower. The victim acknowledged having previously told others that the defendant had taken showers with her in order to conserve water and to make sure she was not cutting herself. She also acknowledged having previously told others that the defendant "would grab [her] boob or smack [her] butt in the shower." The victim denied that the defendant ever got in the bathtub with her. However, she

acknowledged previously stating on a number of occasions, including under oath, that the defendant had done so.

After completing her homeschooled eighth grade year, the victim began attending Nashville School of the Arts ("NSA"), and the defendant visited her at school. Someone from the Department of Children's Services ("DCS") spoke with the victim about concerns that had been raised at school concerning her relationship with the defendant. Rumors were going around the school that she had been "making out" with the defendant. The victim told the DCS worker that nothing had happened and that they were just "a very eccentric family." The victim acknowledged that her mother told her to tell DCS that nothing happened in order to protect their family. However, she explained that her mother was referring to the defendant's grabbing her breasts and checking her hymen – the only two things she admitted actually happened. After DCS became involved, the victim's parents blamed her for telling her friends about the sexual abuse, and her parents discussed moving out of state to prevent the defendant from going to prison. The victim recalled that her parents talked about how the victim's "inability to stay quiet about things happening" was going to have legal repercussions.

The victim acknowledged previously stating that she made the decision to disclose the abuse in 2011 because she was worried about her younger sister. At the time of the disclosure, the victim's sister was the same age that the victim had been when the abuse started, and the victim's sister was also being homeschooled. At trial, however, the victim testified, "It wasn't really a concern about sexual abuse, it was just a convenient thing that fit in with my story."

The victim agreed that she had been fearful her mother and sister would blame her if the defendant went to jail, and she was worried about breaking up her family. However, she acknowledged that she had not broken up her family because, at the time of trial, she was living with her mother, her parents were still together, and she saw the defendant occasionally even though he was not supposed to be around her. However, she denied that the defendant came to her house when she was present. Asked if she wanted to be reunited with the defendant and the family, she responded, "Maybe after a lot of counseling."

The victim claimed that she told stories about the defendant's molesting her in order to make friends at school. She told her friends that she had taken showers and "naked naps" with her father. She elaborated that she told her friends that her father groped her breasts and buttocks during the showers and that he had erections during the naps. She also told them that, on one occasion, the defendant tried to digitally penetrate her vagina. She explained that the defendant "felt down there to see if [she] was aroused" and asked if she "was wet."

3

The victim stated that, in the tenth grade, she got caught performing oral sex on her boyfriend and was taken out of school. After that, she "used the stories that [she] had been telling [about the defendant] to get out of the house because [she] wanted to be with [her] boyfriend at that time." She said that, after the incident with her boyfriend, the defendant developed "all of these rules" and "beat[] the crap out of [her] every morning," so she did not want to be at home and used the stories she had told her friends over the years to get out of the house. She stated that she told Jenny White, her former youth leader, about the alleged abuse because she was afraid of not being able to see her boyfriend again. However, she acknowledged that a few days before she disclosed the abuse to Ms. White, her family had dinner with her boyfriend's family and agreed that she would be able to return to school.

The victim testified that she kept a journal in which she recorded some of the allegations that she told other people. However, she clarified that she "had gone back and written those in." She kept the journal from the ages of thirteen to sixteen, or from the eighth to the tenth grade. She elaborated that she had a "rough draft journal and a final draft journal." The rough draft journal had "all [her] sloppy writing and all of [her] little side notes. And there were pages between them." She later rewrote the journal to look nice so she could give it to her children one day. She claimed that her friends wanted to read her journal, so she "slipped in stuff from [her] stories . . . so it would seem more believable."

The victim read a journal entry dated April 6, 2010, in which she noted that one of her boyfriends "was confronting my dad about the molestation thing. I tried to tell [him] that my dad is a good and honest man; he's confused. He's just ignored me of course." She then read another entry that read: "The [D]epartment of Child Services showed up to talk to me at school. Family isn't in trouble but they will document their visit with the family. We didn't tell them any of the things they would consider indecent." The victim then read another post, dated May 14, 2010, that read:

> DCS is coming to see me at school again today. Apparently either "Jade" or Principal Bob are sending letters to them about dad so they have to interview us again . . . but they believe we are innocent. Mom's getting pissed. She says it's harassment so she's going to try to sue Principal Bob for his job if this keeps happening.

The victim testified that after she was caught performing oral sex on her boyfriend at school, she and her boyfriend were taken to the principal's office and given three days suspension each. She recalled that the defendant was "incredibly pissed off." Although the victim was only suspended for three days, the defendant kept her out of school for

five days. During that time, the victim had to stay in her room, and "every morning . . . [the defendant] would . . . beat the crap out of [her]." He made her hold onto a bedpost while he beat her with a belt. He told her that he would smack her hand if she let go of the bedpost. He called her "white trash" and said that she "would never amount to anything." The victim sustained bruises from her mid-back to her knees from the beating. After the beatings, the victim went into the bathroom while the defendant showered, and they talked. She recalled that the defendant talked about "how he was going to kill [her boyfriend] and [her boyfriend]'s dad, and the usual, just he was pissed." When the victim was hungry and asked for food, the defendant gave her bread, peanut butter and water, which was the only food she had for several days. As a chore, for punishment, she had to carry cinderblocks or logs back and forth across the yard. She understood that she was being punished because she "had given [her] boyfriend a blow job and that is not what Christian girls do."

After the five days had passed, the defendant allowed the victim to return to school, as well as to church and see her youth leader, Jenny White. The victim told Ms. White that her father had locked her in her room for five days and beaten her every day. She also told Ms. White the same things that she had told her friends about the defendant's molesting her when she was being homeschooled in the eighth grade. The victim admitted that she detailed to Ms. White that the defendant had taken showers with her, touched her private areas, and pressed his penis against her body. She admitted that she additionally told Ms. White that the defendant had made her sleep naked with him and touched her on several occasions when that happened. After the victim talked to Ms. White, Ms. White told her that she was legally obligated to report the defendant's conduct. The victim admitted that she never recanted her story to Ms. White.

Following the disclosure to Ms. White, the victim spoke with a detective and told him the same things she had told Ms. White. She agreed to make a controlled phone call to the defendant because the detective told her that "[i]t would help with the case and with removing [her] from the house." The victim recalled that she later participated in a forensic interview, which was audio and video recorded. She also testified in juvenile court on July 11, 2011, and February 21, 2012.

The victim then read a journal entry from April 12, 2011, in which she said:

[The defendant] just burst in my room and said I can never kiss him again or even come within an arm's reach of him. And he said that if [my boyfriend] comes anywhere near me or comes anywhere near he will castrate him and shove [my boyfriend]'s nuts down his dad's father's throat. It just [sic] me off because he threatened [my boyfriend] and [his

father]. I have a lot of respect for [my boyfriend]'s family so it's like he threatened my own family when he said that.

Then [the defendant] went on a rant about different ways to kill [my boyfriend]. One of them was [he] could drive a sword through his stomach, pull upwards to his chest and then let go of the sword. [My boyfriend] would take a sharp last breath and the pulling of air into his lungs would pull the sword deeper into his body. [He] would watch the life leave his eyes and pull the sword back out of his chest.

The victim read another excerpt from her journal, dated April 26, 2011, in which she noted that the defendant had become more protective of her since "he pulled [her] out of eight[h] grade for cutting" but that "he did a lot of things that tour [sic] us apart." The excerpt further noted that she realized her mother and father "blame[d] it on [her], but if they had just let [her] get through the phase on [her] own or if [the defendant] had not molested [her] then [she] would be normal."

Another journal excerpt from April 26, 2011, read:

So today when I was in the car with Jenny [White] she asked me how things are at home. A voice in the back of my head just started to shout that I needed to tell her everything. I was pretty calm about it, that comes with having told the story ten times I guess. After I finished telling her everything; she pulled up to the youth group parking lot and told me that she was legally obligated to call DCS.

She asked to talk to Pastor Todd about it first and find out what's going to happen. She will talk to me before she does anything because I have questions and requests. I don't know whenever someone says abuse, I always think broken bones and rape, not this stuff. I wouldn't have told her, but I don't want [my sister] to go through the same stuff.

I can deal [with] two more years of it, but I don't want her to experience it. She will hate me for taking mom and dad away, but I hope when she's older that she will forgive me.

Mom always said that my first concern should be to protect the family. I tried to keep us together. I have lied to government officials and I hid secrets for four years.

At trial, the victim claimed that the events of which she told Ms. White did not occur.

The victim testified that after her allegations came out, she was placed in the home of an acquaintance from church. She also saw a sex therapist, Shana Frank, at the Nashville Children's Alliance for about a year. During the course of her therapy, the victim never told Ms. Frank that the abuse did not happen. The victim talked to Ms. Frank about the fact that her mother continued to allow the defendant to have contact with her after learning that he was sexually molesting her in the eighth grade. She said that her mother had "good intentions for everything" that happened after the incident between the victim and her boyfriend, explaining that her mother said the defendant "was blowing off steam" during the time he beat her and kept her in her room. However, the victim told Ms. Frank that she wanted to resume a relationship with her mother. The victim stated that she felt extremely guilty about her parents being in court and acknowledged that both of her parents had told her that the problems in their family were her fault.

The victim testified that shortly after she turned eighteen, she returned to live with her mother. The victim admitted that she met with the prosecutor and said that she was concerned about her mother, but she knew that her father had to have some accountability for what he did.

The victim acknowledged having previously told a forensic examiner and testifying at juvenile court on two occasions that the defendant had committed sexual acts on her, starting at the age of twelve or thirteen. Among those actions, the victim had said that the defendant got in the shower with her about every other day "to conserve water and to rebuild the tender bond that [they] had from when [she] w[as] a young child." She acknowledged previously stating that when the defendant got in the shower with her, he would grab her breasts, "feel her up," and have erections. She acknowledged stating that the defendant would hug her and that she would feel his erection against her. She said that on one occasion, the defendant had pre-ejaculate on his penis, which he said never happened with the victim's mother. She acknowledged previously stating that, after the showers, she would take "naked naps" with the defendant. She said that they would "spoon" during those naps, which the defendant called "making love notes by intertwining [their] legs together" and that he would usually fall asleep with his hand on her breast. However, the victim denied that any of those statements were true.

The victim further acknowledged having previously stated, but now said that it was untrue, that the defendant often got erections during their naps together. She also admitted previously stating, but that it was untrue, that, during one naked nap, the defendant woke up with an erection, got on top of her, touched her private area to see "if it was wet and said . . . you're horny too." She had also said that during that same incident, the defendant moved his hand around and made grunting noises, for which he

7

apologized, but that was also untrue.  Another statement the victim admitted previously making but now said was untrue was that on a couple of occasions, the defendant filled the bathtub with water and had her lay on top of him, after which he started thrusting or "humping" his penis against her body.

The victim testified that it was true that the defendant checked her hymen on one occasion during her eighth grade year when she was being homeschooled.  She elaborated that she had to have a kidney removed when she was three years old, and she and the defendant were concerned that the surgery had taken her virginity.  She explained:

> One of the surgeries they couldn't [get] all of the surgical tools up my vagina so they had to make a little incision in my hymen to fit everything in there.  And that's always been something that's kind of been a concern.  I never knew it happened until dad mentioned it one day.
>
> And so I was always really worried about it because virginity is a really big deal in our house.  And so we looked.  We decided to figure out what was going on because I can't see with a mirror.  I didn't know what I was looking for.

The victim stated that she lay on the bed, held "everything open," and the defendant "checked real quick."  The defendant determined that "it was still intact."  The defendant told her that "[t]here was just like a little V cut [out] of it or something, and that it would hurt whenever I lost my virginity."  The victim recalled that the incident was "really awkward and uncomfortable."  The defendant also later told her that she "had a lot of vagina" and asked whether she was a hermaphrodite.  The victim denied that the defendant touched her vagina and moved his hand around until she told him that it was uncomfortable.  She explained that, instead, she spread her genitals apart for the defendant to look.  The victim admitted that the defendant told her not to tell her mother or other people about his playfully grabbing her breasts or checking her hymen because people would think it was sexual abuse.  The victim acknowledged that the defendant's action of checking her hymen was inappropriate and "really weird," but she claimed "there was nothing sexual about it."

The victim admitted that the defendant discussed his and her mother's sex life and told her about her mother's fetishes.  The defendant told the victim that she "stressed him out," which caused his blood pressure to rise such that he had to be on medication.  According to the victim, one of the defendant's medications caused him to easily get erections.  However, the victim stated that the defendant told her that his erections with her caused him to have problems getting erections with her mother.  She acknowledged

8

that the defendant said that he did not have sex with his wife because of her.  The victim elaborated:

> [W]hat I know is that I was stressing dad out and he had blood pressure problems.  And he got on Cialis and he was still having problems having sex with mom.  But when he was around the house just hanging out and I was at the house, it would happen.

The victim denied ever seeing the defendant with an erection despite having previously said that she had.

The victim testified that the defendant came to school to have lunch with her once or twice a week and people started spreading rumors about them.  One rumor was that she "was making out with [her] dad on the back of a motorcycle."  Thereafter, the defendant stopping visiting her for lunch so often.

The victim acknowledged telling prosecutors on the morning of the trial that the defendant had touched her inappropriately.  She discussed with the prosecutors how the defendant had showered with her and touched her breasts and buttocks in the shower.  She also discussed that the defendant got erections.  She referred to the defendant's having pre-ejaculate on his penis and stated that she had asked him about it.  The defendant told her that he did not know what it was because he had never experienced it with the victim's mother.  The victim told prosecutors that the defendant masturbated in the shower when she was in the room.  One time, the defendant filled the bathtub with water and made the victim lie on top of him while he had an erection.  The victim discussed taking "naked naps" with the defendant and his touching her breasts and buttocks.  She explained that the defendant "spooned" her in bed, that his penis came in contact with her, and that he sometimes got erections.  The victim discussed with the prosecutor a particularly upsetting incident when she woke up and the defendant had an erection.  She elaborated that "things got out of hand," and the defendant got on top of her and "started feeling [her] up."  He asked her "if [she] was wet," and she rolled out from underneath him, told him to stop, and left the room.  She told the prosecutors that she and the defendant later talked about it, and he apologized.

The victim acknowledged that, during her conversation with the prosecutor right before the trial, she asked the prosecutor how long of a sentence the defendant faced.  Asked why she did not recant then, the victim responded, "Because everybody has an agenda.  And . . . I'm just . . . tired of having a bunch of attorneys tell me what to do[.]"  She stated that she did not want the guilt of having her father "go to jail when he didn't do most of the stuff."  However, she stated that "[t]here is some stuff he did do that was

9

really wrong, but I'm not going to keep making lies." She acknowledged that the prosecutor did not ask her to embellish the truth.

The victim testified that, even though she told several people about numerous allegations of molestation, even as recently as the morning of trial, the stories were all fabricated. The victim admitted that, in sum, she had told the guidance counsel at NSA, a DCS worker, a forensic interviewer, and an attorney from the district attorney's office that the defendant molested her. She explained that her testimony was different now because she was an adult and understood that there were consequences for lying under oath. The victim admitted that she was having trouble testifying, explaining, "Like I'm trying to split out which parts actually happened and which parts didn't."

Robert Wilson, former principal of NSA, testified that the victim began attending the school in the ninth grade. Prior to attending NSA, the victim attended Two Rivers Middle School, but there was a one-year gap between her attendance at the two schools and nothing in her record to indicate that she was being homeschooled that year. However, the victim passed the tests to be admitted to NSA.

Mr. Wilson testified that sometime during the 2009-2010 school year, he observed some behavior between the victim and the defendant that concerned him. On one occasion, he observed the defendant and the victim leaning against a door together and walking hand-in-hand to the cafeteria. Mr. Wilson followed them and saw them sit in two chairs at the far end of the cafeteria. The victim had her bare feet in the defendant's lap, and he was playing with her toes. Mr. Wilson noted that he had never seen a parent and child interact in such a manner. Mr. Wilson also noted that the defendant was wearing a tank top, which was not proper school attire for students. Therefore, he spoke with the defendant and asked him not to wear tank tops to the school.

Mr. Wilson testified that the defendant called and left him a message stating that he was concerned about what some students were saying about his relationship with the victim. The defendant asked if Mr. Wilson could provide a private place where he and the victim could have lunch together. Mr. Wilson returned the defendant's call and told him that he could not provide a private lunch spot and that if he was concerned about the rumors, "he probably shouldn't come around so much." Within weeks of that conversation, Mr. Wilson observed the defendant and the victim having lunch in the teacher's lounge. He informed them that they did not have permission to be in the teacher's lounge and that they needed to leave. Mr. Wilson stated that, as an educator, he had mandatory reporting obligations regarding suspected child abuse, and he made a referral regarding the victim in April 2011. Mr. Wilson acknowledged that he never saw any acts of molestation or sexual abuse of the victim by the defendant.

Jenny White testified that, in the spring of 2011, she was a youth pastor at Friendship Community Church. The victim's family attended church there, and the victim and her sister attended the mid-week youth group meetings. At some point, Ms. White began giving the victim a ride to church because they lived in the same neighborhood.

Prior to April 2011, the victim shared with Ms. White some "questionable" things about her family that caused Ms. White to inform the victim that she might have to disclose that information to others if the victim continued to share information. This included the defendant's having seen the victim in the shower. Additionally, Ms. White had observed "a lot of physical touching between a father and daughter, a lot. Back rubs, a lot of hugging, kissing on the mouth, that sort of thing that is strange just enough that it would put up a red flag[.]" Then, in April 2011, the victim disclosed to her some information, and Ms. White told her that she would have to disclose that information if they kept talking. The victim was okay with Ms. White disclosing the information and continued to talk to her. Ms. White got the impression from the victim that she did not want to be in the home and "didn't want her sister there either for protection purposes[.]" With the victim's permission, Ms. White called the victim's school and spoke to the principal and guidance counselor. The three of them decided that they needed to make a referral to DCS.

After the referral, Ms. White continued to pick up the victim for youth group meetings. Ms. White assisted law enforcement and DCS in facilitating a meeting with the victim before they spoke to her family. Ms. White picked up the victim for youth group, and officers and DCS spoke to her at church. During that meeting, the victim made a phone call to the defendant. Thereafter, officers asked Ms. White to drive the victim home but had an officer meet them at the house. Ms. White recalled that the victim "was super nervous and was crying." The victim went to stay with another family in the neighborhood. Ms. White continued to take the victim to youth group until the victim eventually began going to another church. The victim never recanted her story to Ms. White.

The victim's former boyfriend testified that he was a graduate of NSA and had dated the victim from his sophomore to his senior year. He described that their relationship "started out a little iffy and then [they] got to become better friends and then towards the end it got a little untrusted[.]" With the exception of the times at the beginning and the end of their relationship, he and the victim were close, "[b]est friends pretty much. We would talk about anything."

The victim's former boyfriend said that, during their sophomore year, he and the victim got into trouble at school and were suspended. At the time of their suspension, he

and the victim were very close. They communicated with each other through Facebook messages during the suspension. The victim told him that the defendant had beaten her. He could tell that the victim appeared to be sad and upset. He was out of school for three days, and the victim returned to school the following week. The victim told him that she wanted to return to school to get away from the house for a while. Just prior to the victim's returning to school, he and his parents had dinner with the victim and her parents.

Prior to the suspension, the victim had indicated to her boyfriend that the defendant had sexually abused her. He was aware that the victim kept journals. A couple of weeks prior to the suspension, the victim asked him to keep one of her journals. Around the time of the suspension, the victim asked him to keep a second journal. He later gave the journals to the police.

Officer Edmond Strickling with the Metro Nashville Police Department's Sex Crimes Unit testified that, in April 2011, he received a referral from DCS and began investigating the alleged sexual abuse of the victim by the defendant. Officer Strickling met with the victim at a church and conducted a detailed interview with her. During the interview, the victim made a controlled phone call to the defendant which was recorded.

During the call, the victim referred to a Bible verse and asked the defendant if they were going to go to hell because they were "sinful people from the stuff [they] did." She stated, "Because I mean we saw each other naked just like it says in the verse[.]" The defendant responded, "I changed your diapers. I saw you naked when you were two. True, things changed, furniture moved, things developed, and it's true that, uh, we did take some liberties that might have been questionable." The defendant then noted that privacy in their household had never been "all that great." The defendant looked up the Bible verse to which the victim had referred and stated that it was talking about brothers and sisters committing incest. The victim asked about taking showers together and "naked naps." The defendant then questioned whether the victim was alone, and she responded affirmatively. The defendant answered, "[W]e didn't have sex. . . . I didn't do anything with the intent of sexual gratification." The victim again asked whether they would go to hell because of the naked naps and the showers, and the defendant stated that he had asked for her forgiveness and "[i]f there was a sin there, it was [his] not [hers]." He then said that he had repented and asked for God's forgiveness, and again that he had asked for her forgiveness "for the times it may have gone a bit far."

The defendant stated that "there were a lot of reasons that seemed to make sense . . . at the time . . . when it was done." He continued, "I backed away from you . . . as you began to develop because I didn't know what to do with it. . . . And I was a little bit panicked about it." He then told the victim, "[Y]ou were starting to throw off

12

pheromones that were making my body respond in ways that were extremely embarrassing to me." He stated that he went to a therapist but stopped going because the therapist suggested that his actions were sexual abuse. He noted that "from a certain point of view, [the therapist] may have had a point." The defendant stated that, as the victim got older, he needed to reestablish the bond that he had with her as a child. He stated, "I felt the strongest bond to you as a child was when I'd lay on the couch and lay you on my chest and you'd sleep on my chest. . . . That was skin to skin." The defendant claimed that the "naked naps" were to try to bond with the victim again. The defendant said that he was "trying so hard to control what was happening down there" when he was around the victim that he was experiencing trouble having sex with his wife.

The victim referred to the defendant's touching her, and he responded, "I guess, I did." He elaborated, "I examined your hymen twice because I was trying to learn about it and trying to figure out what to do about yours. Um, but I never touched your clitoris. I never tried to arouse you. Did I?" The victim responded that he did, and the defendant apologized. The victim told the defendant, "There was one time when you woke up from the nap, and you had [an erection] and you – it got scary, and that's when I jumped out of the bed, and you came out ten minutes later and apologized." The defendant said he remembered that incident and "that was what [he] was asking for forgiveness for. That was . . . off the charts, and that was wrong." He explained that he was waking up and "trying to deal with [her] pheromones, and [he] really didn't have a handle on it at the time, and . . . it went too far."

The defendant said that he thought he needed to educate the victim about sex. He noted that "privacy was already . . . lost in this house anyway" and he "always kind of had a slight nudist vent anyway," but "[t]he biggest problem was that [he] kept getting [erections] anytime [he] was around [her]." Toward the end of the conversation, the defendant stated that "there w[as] at least one occasion where it went entirely too far. Um, I did examine your hymen." He elaborated that he thought the doctor who performed surgery on her when she was toddler had "took her virginity."

After the call, Officer Strickling went to the defendant's home and confronted him about the allegations of sexual abuse. Officer Strickling audio-recorded his conversation with the defendant. The defendant denied the allegations of sexual abuse. Officer Strickling later spoke to Dominick Carson and his parents. Mr. Carson provided Officer Strickling with the victim's journals that he had in his possession.

The defendant did not testify or present any evidence.

Following the conclusion of the proof, the jury convicted the defendant of six counts of sexual battery by an authority figure and one count of rape.

# ANALYSIS

## I. Sufficiency of the Evidence

The defendant contends that the evidence is insufficient to support his convictions. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human

14

> atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523, 527 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The State elected the following facts for the six counts of sexual battery by an authority figure and the one count of rape:

> Count 1 – The defendant touched the victim's breast in the shower.
>
> Count 2 – The defendant touched the victim's body with his erect penis while hugging her in the shower.
>
> Count 3 – The defendant touched the victim's body with his erect penis while the victim was lying on top of him in the bathtub.
>
> Count 4 – The defendant touched the victim's breast while they were lying naked in the bed.
>
> Count 5 – The defendant touched the victim's naked body with his erect penis when he got on top of her in the bed.
>
> Count 6 – The defendant touched the victim's genitals to see if she was "wet" while they were lying naked in the bed.
>
> Count 7 – The defendant penetrated the victim's genitals with his hand when he "checked her hymen."

Sexual battery by an authority figure is defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim [when] . . . [t]he victim was, at the time of the offense, thirteen (13) years of age or older but less than eighteen (18) years of age . . . [and] [t]he defendant had, at the time of the offense, parental . . . authority over the victim and used the authority to accomplish the sexual act." Tenn. Code Ann. § 39-13-527(a)(1), (3)(B). "'Sexual contact' includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" Id. § 39-13-501(6). Rape is defined as "unlawful sexual penetration of a victim by the

defendant or the defendant by a victim [when] . . . [f]orce or coercion is used to accomplish the act[.]" Id. § 39-13-503(a)(1). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, or any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Id. § 39-13-501(7). Coercion can include the "use of parental, custodial, or official authority over a child less than fifteen (15) years of age[.]" Id. § 39-13-501(1).

The defendant contends that the evidence is insufficient to support his convictions because the victim recanted her previous allegations of sexual abuse at trial. He also argues that his checking the victim's hymen does not meet the definition of "unlawful" under the rape statute.

Although the victim recanted her prior allegations of sexual abuse at trial, she acknowledged that she had repeatedly and consistently stated prior to trial that the defendant had sexually abused her. Without objection, the State admitted the victim's testimony from two prior juvenile court hearings in which the victim detailed the sexual abuse by the defendant. During those hearings, the victim testified that she and the defendant showered together and that the defendant grabbed her breasts and often had erections in the shower. The victim stated that, after the showers, she and the defendant took "naked naps" together, and the defendant fell asleep "spooning" the victim with their legs intertwined and his hand on her breast. She said that the defendant often got erections during their naps together. On one occasion, while taking a naked nap, the defendant woke up with an erection, got on top of her, touched her private area to see if she was aroused, and noted that she was "horny" also. On another occasion, the defendant filled the bathtub with water and had the victim lie on top of him, after which he started thrusting his erect penis against her body. On at least one occasion, the defendant penetrated the victim's vagina while examining her hymen to check her virginity.

At trial, even though she denied that many of her prior allegations of sexual abuse had occurred, the victim acknowledged that the defendant checked her hymen when she was thirteen years old. She explained that the defendant was concerned that she was no longer a virgin because of a surgery she had when she was three years old. She admitted that the defendant grabbed and squeezed her breasts and smacked her buttocks. The defendant also discussed masturbation with her and offered to buy her a vibrator.

In addition, following the victim's disclosure of abuse, she made a recorded phone call to the defendant, during which the defendant admitted to inappropriate behavior with the victim. During the call, the defendant acknowledged seeing the victim naked and "tak[ing] some liberties that might have been questionable." The victim asked the

16

defendant about their taking showers and "naked naps" together. The defendant noted that they did not have sex and that he had asked for her forgiveness. The defendant told the victim that "as [she] began to develop," she "start[ed] to throw off pheromones that were making [his] body respond in ways that were extremely embarrassing to [him]." He stated that he went to a therapist but stopped going because the therapist suggested that his actions were sexual abuse and that, "from a certain point of view, [the therapist] may have had a point." The defendant acknowledged having taken naked naps with the victim and explained that he did so in an effort to bond with her again. The defendant said that he was "trying so hard to control what was happening down there" when he was around the victim that he was experiencing trouble having sex with his wife.

The defendant admitted touching the victim in that he examined her hymen twice. However, he claimed that he never touched her clitoris or tried to arouse her, at which point the victim responded that he did and the defendant apologized. The victim told the defendant, "There was one time when you woke up from the nap, and you had [an erection] and you – it got scary, and that's when I jumped out of the bed, and you came out ten minutes later and apologized." The defendant said that he remembered the incident and "that was what [he] was asking for forgiveness for. That was . . . off the charts, and that was wrong." He explained that he was waking up and "trying to deal with [her] pheromones, and [he] really didn't have a handle on it at the time, and . . . it went too far." The defendant admitted getting erections when he was around the victim.

Furthermore, the victim's church youth leader and school principal testified regarding questionable behavior by the defendant. Jenny White, the victim's church youth leader, testified that the victim previously told her that the defendant had seen her in the shower, and she had observed "a lot of physical touching between a father and daughter, a lot. Back rubs, a lot of hugging, kissing on the mouth, that sort of thing that is strange just enough that it would put up a red flag[.]"

Robert Wilson, the victim's school principal, testified that the defendant visited the school often. He recalled an instance when he observed the defendant and the victim leaning against a door together and walking hand-in-hand to the cafeteria. He followed them and saw them sit in two chairs at the far end of the cafeteria. The victim had her bare feet in the defendant's lap, and the defendant was playing with her toes. Mr. Wilson noted that he had never seen a parent and child interact in such a manner. He recalled that the defendant asked him for a place where he and the victim could have lunch in private because he was concerned about what some students were saying about his relationship with the victim. Mr. Wilson told the defendant that he could not provide a private lunch spot but, within weeks of that conversation, Mr. Wilson observed the defendant and the victim having lunch together in the teacher's lounge without permission.

As was its prerogative, the jury chose not to accredit the victim's testimony at trial in which she testified that her previous allegations were not true. The jury heard testimony that at the time of trial, the victim was living with her mother, her parents were still together, and the victim occasionally saw the defendant. The victim admitted that the guilt of having her parents in court was difficult for her and that her parents had told her that the problems in their family were her fault. In the light most favorable to the State, the evidence is sufficient for a rational trier of fact to find that the defendant committed the acts of sexual abuse against the victim for the purpose of sexual arousal or gratification and that the defendant used his parental authority to commit the act of rape against the victim by telling her that he was concerned that she had lost her virginity during a surgery when she was young and needed to examine her hymen.

## II. Admission of the Victim's Forensic Interview

The defendant argues that the trial court erred in allowing the State to introduce the victim's forensic interview as substantive evidence at trial. The defendant asserts that the interview was improperly admitted as a hearsay exception because the exception under which it was admitted, Tennessee Rule of Evidence 803(26), referenced and required compliance with Tennessee Rule of Evidence 613(b) and under Rule 613(b), the forensic interview would have been inadmissible as "cumulative."

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible at trial unless it falls under one of the exceptions to the rule against hearsay. Tenn. R. Evid. 802.

Tennessee Rule of Evidence 803(26) provides for an exception to the rule against hearsay for a testifying witness's prior inconsistent statement and allows the statement to be admitted as substantive evidence if the following conditions are satisfied:

(1) The statement must be otherwise admissible under Rule 613(b).

(2) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.

(3) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.

(4) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26) & Advisory Comm'n Cmts. Rule 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon[.]"

> Extrinsic evidence of a prior inconsistent statement remains inadmissible when a witness unequivocally admits to having made the prior statement. The unequivocal admission of a prior statement renders the extrinsic evidence both cumulative and consistent with a statement made by the witness' during trial. Extrinsic evidence of a prior consistent statement is generally inadmissible and not subject to Rule 613(b).

State v. Martin, 964 S.W.2d 564, 567 (Tenn. 1998) (internal citations and footnote omitted).

Prior to trial, the victim made numerous allegations of sexual abuse against the defendant. However, she recanted most of those allegations at trial. As a result, the State sought to introduce the forensic interview that the victim had given in which she alleged sexual abuse by the defendant. The State also sought to introduce the victim's testimony at two juvenile court hearings. Defense counsel agreed that the victim's statements at trial were inconsistent with her previous statements. However, he objected to the introduction of the forensic interview on the grounds that it violated the defendant's right to confrontation and that it was unreliable. Defense counsel conceded that the juvenile court hearings could be introduced.

The trial court agreed that the testimony from the juvenile court hearings could be introduced. The court also found that the State could introduce portions of the forensic interview for impeachment. The court noted that the interview occurred close in time to the alleged offenses and was recorded. The court also noted that the victim's story of sexual abuse had been consistent for a period of more than three years. Defense counsel stated that, if portions of the forensic interview were going to be introduced, he wanted the entire interview to be introduced. Thereafter, the State played the forensic interview for the jury.

At the onset, we determine that the defendant has waived his claim that the trial court erred in allowing the State to introduce the forensic interview as substantive evidence at trial. Although the defendant objected to the introduction of the interview, he

did so solely on the grounds that it violated his right to confrontation and that it was unreliable. He never argued, as he does on appeal, that the interview could not be introduced because the victim admitted making the prior statements, resulting in the proof's being cumulative and consistent. It is "'elementary that a party may not take one position regarding an issue in the trial court, change his strategy or position in mid-stream, and advocate a different ground or reason in this Court.'" State v. Adkisson, 899 S.W.2d 626, 635-36 (Tenn. Crim. App. 1994) (quoting State v. Dobbins, 754 S.W.2d 637, 641 (Tenn. Crim. App. 1988)). Thus, this issue is waived.

## III. Sentencing

The defendant lastly argues that the trial court abused its discretion in imposing an effective twenty-two-year sentence in confinement.

Under the 2005 amendments to the sentencing act, a trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles,

20

along with any enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. In State v. Caudle, our supreme court clarified that the "abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." 388 S.W.3d 273, 278-79 (Tenn. 2012).

Under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-102(6)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6).

A defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed on the defendant is ten years or less. Id. § 40-35-303(a). A defendant is not, however, automatically entitled to probation as a matter of law. The burden is upon the defendant to show that he is a suitable candidate for probation. Id. § 40-35-303(b); State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. Bingham, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis. Id. Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. Goode, 956 S.W.2d at 527. Also relevant is whether a sentence of probation would unduly depreciate the seriousness of the offense. See State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997); Bingham, 910 S.W.2d at 456.

In determining if incarceration is appropriate in a given case, a trial court should consider whether:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1). Furthermore, the defendant's potential for rehabilitation or lack thereof should be examined when determining whether an alternative sentence is appropriate. Id. § 40-35-103(5).

Additionally, the trial court may order multiple sentences to run consecutively if it finds by a preponderance of evidence that any one or more of seven different factors apply, including that:

The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

See Tenn. Code Ann. § 40-35-115(b)(5).

We, therefore, review the trial court's sentencing determinations for an abuse of discretion with a presumption of reasonableness afforded to the trial court's decision. See Bise, 380 S.W.3d at 706; State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013).

The trial court conducted a sentencing hearing, at which the victim's younger sister testified that she was removed from her parents' home because of allegations that the victim had been sexually abused. After moving out of her parents' home, she continued to have visitations with her mother. The victim eventually moved in with their mother and, when the victim's sister visited their apartment, she observed things that indicated the defendant might be living there also although he was not supposed to be around the victim. The victim's sister learned that the victim testified at trial that the defendant had not sexually abused her. She was "aggravated" by her sister's testimony but "sort of expected it" because the victim was "persuaded . . . or pressured" by their mother not to testify against the defendant. The victim's sister testified that, when she

22

was ten to twelve years old, the defendant used a belt, spoon, or phone charger to beat her and left bruises when he did so. She also saw the defendant swing the victim around by the hair. She said that the defendant's acts of physical violence varied in frequency from month to month.

The victim's sister recalled an occasion when the defendant came into the bathroom while she was taking a shower and sat on the toilet. The defendant opened the shower curtain and looked at her naked body. The defendant told her not to tell her mother what he was doing. This occurred a year or more before the victim made the allegations in this case. The victim's sister testified that the defendant saw her naked on "[p]lenty" of other occasions and stated that "it was a casual thing." The victim's sister acknowledged that she did not make any allegations of abuse against the defendant. She explained that, at the time she was questioned, she did not realize that what the defendant had done was not normal. However, she testified that the defendant never touched her sexually.

In an allocution to the court, the defendant asked for mercy and leniency. He stated that he had no prior criminal record and did not smoke, drink, or use drugs. He said that he and his wife were virgins when they got married, and he had never been unfaithful to her. He stated that he had been an employee in good standing with UPS for twenty years. He told the court, "I cannot in good conscious claim guilty for the crimes I've been convicted of. My daughter and I have fallen squarely across Ephesians chapter 6, vers[e]s 1 through 4. And Your Honor, that's all I have to say." The defendant also provided six character references.

After the conclusion of the hearing, the trial court took the matter under advisement and later issued a written sentencing order. The trial court enhanced all of the defendant's sentences upon finding that he had a previous history of criminal behavior due to his assaultive behavior against the victim's sister. See Tenn. Code Ann. § 40-35-114(1). The court also enhanced all of the defendant's sentences upon a finding that the offenses were committed to gratify the defendant's desire for pleasure or excitement, noting that the testimony "indicated that the defendant discussed his sexual arousal with the victim and indicated that his interactions with the victim caused him to have an erection." See id. § 40-35-114(7). The court enhanced the defendant's sentence for the rape conviction only upon finding that he abused a position of private trust because he "accomplished the act . . . through the use of his relationship of trust as the father, and the victim his daughter." See id. § 40-35-114(14).

As for mitigating considerations, the trial court acknowledged the letters submitted in support of the defendant. However, the court "place[d] no weight on the letter[s] based upon the weight of the testimony and evidence presented at trial."

23

After considering the enhancing and mitigating factors, principles of sentencing, and the nature of the crimes, the court imposed a five-year sentence as a standard offender for each count of sexual battery by an authority figure, and a twelve-year sentence as a violent offender on the rape count.

The court imposed partial consecutive sentencing upon finding by a preponderance of the evidence that the defendant committed "multiple acts of sexual abuse . . . over several years." The court noted that:

> As the father of the victim, the defendant would compare the victim's breasts to her mother's, fondle her breasts, talk with her about his masturbation habits, watch her in the shower and take showers with her, take naked naps while lying with her, masturbate in front of her and digitally penetrated her. All of these actions indicate a wide scope of abuse that went undetected by authorities for several years.

Accordingly, the court ordered that the sentences in counts one, six, and seven be served consecutively to the others for an effective sentence of twenty-two years.

The defendant argues that the trial court erred in determining the length of his sentences, in ordering partial consecutive sentencing, and in denying alternative sentencing. However, the record supports the enhanced sentences imposed by the trial court. The defendant has a previous history of criminal behavior due to his physically assaultive behavior toward both the victim and the victim's sister, as testified to by both young women. In addition, there is evidence in the record to support that the offense of rape was committed to gratify the defendant's desire for pleasure or excitement in that the defendant discussed his sexual arousal with the victim and indicated that his interactions with her caused him to have an erection. Even if the trial court erred in considering some enhancing factors as to some convictions, the defendant is not entitled to relief because "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the [sentencing act]." Bise, 380 S.W.3d at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id. The record supports the length of sentences imposed by the trial court.

With regard to consecutive sentencing, the record shows that the defendant engaged in the sexual abuse of the victim for a period of two years. In a prior statement, the victim said that the defendant engaged in this behavior about every other day. During that time, they showered together, took "naked naps" together, and the defendant checked

the victim's hymen.  Following her disclosure of the abuse, the victim saw a therapist for one year.  We cannot conclude that the trial court abused its discretion in imposing partial consecutive sentencing.

With regard to the trial court's not imposing an alternative sentence, we note that the defendant was not eligible for probation as the sentence he received was greater than ten years.  Moreover, the record shows that confinement is necessary to avoid depreciating the seriousness of the offenses and that the defendant has a lack of potential for rehabilitation in that the defendant, as noted by the State at sentencing, "has no clue . . . how very, very disturbing and inappropriate his behavior is and criminal.  For that reason, some sort of less restricted alternative counseling treatment . . . would be wildly ineffective and pointless."

In addition, although the defendant suggests that the trial court failed to consider statistical information provided by the Administrative Office of the Courts, the court clearly stated that it had considered all relevant sentencing information, and the record gives us no reason to doubt the court's statement.

Moreover, as to the defendant's complaint that he did not submit to a sexual evaluation as part of the presentence report, he is not entitled to relief.  Tennessee Code Annotated section 39-13-705(a) provides that every "sex offender who is to be considered for probation or any other alternative sentencing shall be required to submit to an evaluation for treatment, risk potential, procedures required for monitoring of behavior to protect victims and potential victims, and an identification under the procedures developed pursuant to § 39-13-704(d)(1)."  Id.

> Those offenders found guilty at trial or who pled guilty without an agreement as to length of sentence, probation, or alternative sentencing that are to have a presentence report prepared for submission to the court shall be required to submit to the evaluation referred to in subsection (a).  The evaluation shall be included as part of the presentence report and shall be considered by the court in determining the sentencing issues stated in this section.

Id. § 39-13-705(b).  "The evaluation and identification required by subsection (a) shall be at the expense of the offender evaluated, based upon the offender's ability to pay."  Id. § 39-13-705(c).

The defendant, however, never objected at sentencing to the absence of the report and has thus waived this issue.  See Tenn. R. App. P. 36(a).  In addition, because no objection was made at the hearing, it is not clear whether the defendant submitted to an

evaluation. Absent a showing that he submitted to the evaluation, the defendant "cannot establish on appeal his claim to a non-incarcerative sentence because he failed to submit to the requisite sex offender evaluation and to ensure that the report generated therefrom was considered by the lower court in passing sentence on him." See State v. Richard Albany Goode, No. E2002-01228-CCA-R3-CD, 2003 WL 1737904, at *2 (Tenn. Crim. App. Apr. 2, 2003). Furthermore, because the trial court imposed a sentence of twelve years on the rape conviction, the defendant was ineligible for probation on that conviction and would have been evaluated once in custody. See State v. Evangeline Combs and Joseph D. Combs, Nos. E2000-02801-CCA-R3-CD, E2000-02800-CCA-R3-CD, 2002 WL 31118329, at *77 (Tenn. Crim. App. Sept. 25, 2002), perm. app. denied (Tenn. Jan. 27, 2003) ("[W]here a sex offender is destined to be incarcerated regardless of the contents of the report, a trial court's failure to consider it at the time of sentencing is immaterial and a waste of resources.")

In sum, the record reflects that the trial court imposed the sentence after proper consideration of all the evidence and testimony, the purposes and principles of our sentencing act, and consideration of the enhancement and mitigating factors. See Bise, 380 S.W.3d at 706. In light of the presumption of correctness attendant to the trial court's findings, we discern no abuse of discretion in the trial court's imposition of a term of twenty-two years.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court. However, we note that the judgment form in Count 7 incorrectly reflects the rape conviction as a Class C felony. Therefore, we remand for entry of a corrected judgment, showing that the rape conviction is a Class B felony.

_____
ALAN E. GLENN, JUDGE